# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROVENA HARDRICK, as** | ) | |
| **Administratrix of the estate** | ) | |
| **of Bert Eugene Winston,** | ) | |
| **Jr., deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-16-S-1212-NE** |
| | ) | |
| **CITY OF BRIDGEPORT,** | ) | |
| **ALABAMA, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case grew from the death of Bert Eugene Winston, Jr., a 48-year-old, intellectually-challenged, African-American man who could not swim, and who drowned in the municipal swimming pool of the City of Bridgeport, Alabama.[1] The action was filed by Winston's sister, Rovena Hardrick, who sues in a representative capacity, as Administratrix of the estate of her deceased brother. This opinion

---

[1] *See* doc. no. 1-1 (State Court Pleadings), at ECF 146 (First Amended Complaint), ¶ 12; *id*. at ECF 148, ¶ 24; doc. no. 43-6 (Rovena Hardrick Deposition), at 63. **Note**: "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). *See The Bluebook: A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010). When this court cites to pagination generated by the ECF header electronically imprinted on a scanned copy of an original document filed in this case, it will, as in this footnote, precede the page number(s) with the letters "ECF."

addresses the various defendants' motions for summary judgment.[2]  Other pending

motions are not addressed.[3]

# I. PROCEDURAL HISTORY

Plaintiff commenced this action in the Circuit Court of Jackson County,

Alabama.  Her complaint contained a single count, seeking damages from the City of

Bridgeport for the death of her brother under Alabama Code § 6-5-410 (1975), the

---

[2] *See* doc. no. 38 (Motion of Lifeguard Brittany Mason); doc. no. 40 (Motion of Councilman Barry Hughes); and doc. no. 44 (Motion of the City of Bridgeport and Mayor David Hughes).

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

[3] *See* doc. nos. 47 & 48 (Plaintiff's Motions to Strike the testimony of Dr. Jack Kalin and Steve Scheuer), and doc. no. 59 (Defendant Barry Hughes's Motion to Preclude the Testimony of Dr. Roger Rinn and Dr. Brian Frist).

State's wrongful death statute.[4]  The state judge denied the City's motion to dismiss;[5]

and, following more than a year of discovery, plaintiff filed a "First Amended

Complaint" seeking damages under the same state statute from not only the City of

Bridgeport, but also Mayor David Hughes, City Councilman Barry Hughes,[6] and the

municipal pool's head lifeguard, Brittany Mason.[7]

Significantly, the amended complaint also contained two claims asserted under

42 U.S.C. § 1983.  Count Eight alleged that defendants deprived Bert Eugene

---

[4] *See* doc. no. 1-1 (State Court Pleadings), at ECF 1-6 (Original Complaint).  Plaintiff alleged that the City (and nine defendants fictitiously identified by the Arabic numerals "1" through "9")

> negligently, willfully, recklessly, and/or wantonly (1) failed to properly maintain, repair, treat and/or inspect the Pool [in which her decedent drowned], including its pumping and filtration systems; (2) allowed use of the Pool in an unsafe condition; (3) failed to attempt to rescue decedent; (4) failed to warn decedent of the dangers and hazards present at the Pool; (5) failed to take adequate safety measures to prevent the death of decedent; (6) failed to adequately train, supervise, certify and/or manage the safety procedures and personnel at the Pool; and (7) failed to provide a safe premises to decedent.

*Id*. at ECF 4, ¶ 17; *see also id*. at ECF 5, ¶ 19 (same).

[5] *See id.* at ECF 27-28 (City's Motion to Dismiss); and *id*. at 107 (Order striking plaintiff's contention that "wanton" misconduct could be a basis for imposing liability upon the City).  *See also* Ala. Code § 11-47-190 (1975) (2008 Replacement Vol.) ("No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through *the neglect, carelessness, or unskillfulness* of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, . . . .") (emphasis and ellipses supplied).

[6] **Note**:  Despite their common surnames, Mayor David Hughes and Councilman Barry Hughes are not related.  *See, e.g*., doc. no. 46-4 (Councilman Barry Hughes Deposition), at 17.

[7] *See* doc. no. 1-1 (State Court Pleadings), at ECF 143-56 (First Amended Complaint).  The amended complaint, like the original pleading, alleged claims against nine defendants fictitiously identified by the Arabic numerals "1" through "9," *id.* ¶¶ 6-8, at ECF 145, and ¶¶ 52-63, at ECF 156-59, but such claims are not cognizable in federal court.

Winston, Jr., of his Fourteenth Amendment substantive due process right to life "by affirmatively subjecting [him] to an increased danger/risk of harm that was created by Defendants, and subsequently failing to protect him from that harm, resulting in his death."[8] Count Nine alleged that defendants deprived plaintiff's brother of his Fourteenth Amendment right to equal protection of the laws because of his race.[9] Defendants jointly filed a timely notice removing the case to this court pursuant to 28 U.S.C. §§ 1441 and 1446, based upon federal question jurisdiction of the foregoing claims under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").[10]

The consolidated brief filed by plaintiff in opposition to defendants' respective

---

[8] *See* doc. no. 1-1 (State Court Pleadings), at ECF 160 (First Amended Complaint), ¶ 65 (alteration supplied).

[9] The pertinent portions of Count Nine alleged that defendants,

collectively or separately, acting under the color of state law, violated 42 U.S.C § 1983 by depriving Decedent of his Fourteenth Amendment equal protection rights by subjecting Decedent to [an] increased danger/risk of harm and failing to administer a prompt and diligent rescue of Decedent.

72. Decedent was African-American and was unlawfully subjected to increased danger based on his race. Defendants' inadequate supervision, and delayed and wholly deficient rescue efforts, were also racially motivated and violated Decedent's constitutional rights.

*Id*. at ECF 161-62 (First Amended Complaint), ¶¶ 71-72 (alteration supplied).

[10] *See* doc. no. 1 (Notice of Removal).

4

motions for summary judgment admitted that there was "insufficient evidence to support a claim of racial discrimination against Defendant Brittany Mason."[11] During oral argument on the motions for summary judgment, plaintiff's counsel expanded that admission and conceded that there was not sufficient evidence to support an equal protection claim against *any* defendant. Accordingly, the claims alleged in Count Nine were withdrawn. The discussion in the remainder of this opinion addresses only the claims asserted in Count Eight. The relevant portions read as follows:

> 65. Defendant City of Bridgeport; Councilman Hughes, in his individual capacity; Mayor Hughes, in his individual capacity; and Lifeguard Mason, in her individual capacity, collectively or separately, acting under the color of state law, violated 42 U.S.C. § 1983 by depriving Decedent of his Fourteenth Amendment due process right to life by affirmatively subjecting Decedent to an increased danger/risk of harm that was created by Defendants, and subsequently failing to protect him from that harm, resulting in his death.

> 66. As set out more fully above, Defendant City of Bridgeport, Councilman Hughes, Mayor Hughes, and Lifeguard Mason created or enhanced a danger by, but not limited to, (1) failing to properly maintain, repair, treat and/or inspect the Pool, including its pumping and filtration systems; (2) allowing use of the Pool in an unsafe condition; (3) failing to warn Decedent of the dangers and hazards present at the Pool; (4) failing to take adequate safety measures to prevent the death of Decedent; (5) failing to adequately hire, train, supervise, certify and/or manage the safety procedures and personnel working at and/or in charge of the Pool; and (6) failing to provide safe premises for the use

---

[11] Doc. no. 75 (Plaintiff's Consolidated Brief in Opposition to All Defendants' Motions for Summary Judgment), at 16.

of Decedent and others.

 67. The increased danger/risk of harm to Decedent was known by Defendants, and Defendants acted recklessly and/or with deliberate indifference in endangering the Decedent as set out above.

 68. The harm suffered by Decedent was foreseeable, and Defendants failed to protect him from that harm.

 69. As a proximate consequence of Defendants' reckless and/or conscious indifference, Decedent was deprived of his life.

Doc. no. 1-1 (State Court Pleadings), at ECF 159-61 (First Amended Complaint), ¶¶ 65-69.

## II. FACTS

 Bert Eugene Winston, Jr. ("Winston"), drowned on Saturday, July 12, 2014, while attending a picnic and pool party sponsored by the First Missionary Baptist Church at the City of Bridgeport's municipal swimming pool.[12] That facility had been closed during the previous week due to the condition of the water.[13] Barry Hughes, the City Councilman charged with supervision of parks and recreational facilities, had recommended to Mayor David Hughes that the pool be closed because the water "was dirty" and contained "a lot of algae."[14] Councilman Hughes assigned

---

[12] *See* doc. no. 43-11 (Patricia Brocks Deposition), at 24-25; doc. no. 46-1 (Plaintiff's Deposition), at 65.

[13] *See* doc. no. 46-2 (Mayor David Hughes Deposition), at 40 (pool closed from July 5 through morning of July 12, 2014); doc. no. 46-3 (Brittany Mason Deposition), at 20; doc. no. 46-4 (Councilman Barry Hughes Deposition), at 43-44.

[14] *See* doc. no. 46-4 (Councilman Barry Hughes Deposition), at 44.

the duty of treating the pool's water and returning it to an acceptable level of clarity and quality to the head lifeguard, Brittany Mason.[15]

Even though Mason had no formal training in pool maintenance, she was charged with the responsibility of checking and recording the chemical levels of the pool's water on a daily basis. Another City employee, Lindon Doyle ("Dodie") Coffman, was responsible for adding chemicals to the pool water during evenings,[16] and, maintaining the pool's pump and filtration system.[17] During the week prior to the church function, Mason deposited a chemical named "Drop Out" in the water for the purpose of breaking up the algae,[18] and vacuumed the organisms when they settled to the bottom.[19] Even so, there is no record indicating whether she, or anyone else, measured chemical levels during the period that the pool was closed for cleaning the water.[20]

On the date scheduled for the church's picnic and pool party, Mason asked

---

[15] *Id.* at 52.

[16] *See* doc. no. 39-1 (Brittany Mason Deposition), at 18.

[17] *See* doc. no. 39-5 (Lindon Doyle "Dodie" Coffman Deposition), at 19.

[18] *See, e.g.*, http://www.hydropool.com/cgi-bin/hydro/item/Pool-Chemicals (last visited May 24, 2018).

[19] *See* doc. no. 39-1 (Brittany Mason Deposition), at 21, 26; doc. no. 46-4 (Councilman Barry Hughes Deposition), at 52-54.

[20] *See* doc. no. 39-1 (Brittany Mason Deposition), at 16. (Other persons also checked and recorded chemical levels in the water, as reflected by the "Pool Chemical Check List" appended to Brittany Mason's deposition as Exhibit 2.)

Councilman Barry Hughes to bring her a spare key to the lock on the pool gate because she had lost her own.[21]  When Hughes arrived around 11:00 a.m., Mason asked him whether the pool should be reopened, because the water clarity remained so murky that "you could barely see the lines in the shallow end."[22]  Mason believed the water condition to be "unsafe,"[23] because "[y]ou couldn't even stick your hand in [the water] and see it."[24]  Councilman Hughes apparently entertained independent concerns about the water, because he telephoned Mayor David Hughes to discuss the advisability of reopening the pool.[25]  The Mayor told Councilman Hughes to use his own judgment because he (the Mayor) could not see the condition of the water.[26]  Councilman Hughes ultimately decided to reopen the pool for not only the persons attending the First Missionary Baptist Church picnic, but the public generally.[27]

Winston arrived at the church shortly after 8:00 a.m. on Saturday morning, July

---

[21] *See* doc. no. 46-4 (Councilman Barry Hughes Deposition), at 54-55 ("What happened was I went by the pool and she [Brittany Mason] had lost her key and I opened the pool . . . to let her in.") (alterations supplied); *id*. at 60-61.

[22] Doc. no. 39-1 (Brittany Mason Deposition), at 28.

[23] *Id*., lines 15-23 ("**Q**.  Were you surprised that Mr. Hughes opened the pool?  **A**.  Yes, sir. **Q**.  Why were you surprised?  **A**.  Because you could barely see the lines in the shallow end.  **Q**. *Did you believe that to be unsafe?  * * * *  **A**.  Yes*.") (ellipsis and emphasis supplied).

[24] *Id*. at 44 (alterations supplied).  *But see* doc. no. 46-4 (Councilman Barry Hughes Deposition), at 63 ("**Q**.  Did Brittany [Mason] express any concerns about the cloudy water?  **A**. No") (alteration supplied).

[25] *See* doc. no. 46-4 (Councilman Barry Hughes Deposition), at 58-60.

[26] *See* doc. no. 46-2 (Mayor David Hughes Deposition), at 44.

[27] Doc. no. 46-4 (Councilman Barry Hughes Deposition), at 63, lines 8-10.

12, 2014, to assist Patricia Brocks in loading supplies for the picnic into the church van.[28] He rode with Ms. Brocks to the park and assisted in preparing for the picnic.[29] After Councilman Barry Hughes and head lifeguard Brittany Mason unlocked the gate of the fence surrounding the pool, some church members, including Winston, entered.[30]

The attention of church member Jennifer Thomas was drawn to Winston while he frolicked with some of the children near the rope that marked the end of the shallow part of the pool and the beginning of the deep water: "he was hollering at the kids" and saying "I bet you can't catch me. And he was inching back from them."[31] Ms. Thomas described her perception of the condition of the water at that time as "green. It was almost green. It was really dark and cloudy."[32] She stated that it was possible to see the bottom in the most shallow, three-foot-deep part of the pool, but the clarity of the water in the deep end "was horrible. There was no way that you could see anything off of the twelve-foot."[33]

---

[28] Doc. no. 43-12 (Patricia Brocks Deposition), at 64. ***Nota bene***: The initial part of Ms. Brocks's deposition (depo. pages 1-48) is identified as doc. no. 43-11, and the remainder (depo. pages 49-101) as doc. no. 43-12.

[29] Doc. no. 43-12 (Patricia Brocks Deposition), at 66.

[30] *See* doc. no. 39-1 (Brittany Mason Deposition), at 29.

[31] Doc. no. 43-14 (Jennifer Thomas Deposition), at 43.

[32] *Id.* at 32.

[33] *Id. See also* doc. no. 43-10 (William Hardrick Deposition), at 55 ("green water, murky green water"); doc. no. 43-11 (Patricia Brocks Deposition), at 32 ("It was like an olive green . . . [i]t

While playing with the children near the rope marking the edge of the deep water, Winston walked backwards and "slipped" under;[34] "he didn't come back up."[35]

A ten-year-old girl identified in this record only as "C.B." ran to a lifeguard and said, "He is drowning," but the lifeguard just looked at her and said "stop lying."[36]

Jennifer Thomas did not see Winston go under the water, but she had "seen him inching back toward [the rope marking the change in depth], and I turned around, looked back, and I didn't see him any more."[37] She did not immediately appreciate that Winston was in any danger, because she did not know that he could not swim.[38] However, when in "just a few minutes" she was told by a child that Winston had gone under the water and "didn't come back up,"[39] Thomas asked a female lifeguard with blond hair (subsequently identified as Amanda Nicole Duke) to loan her goggles for

_____

was like sea water . . . cloudy and green.") (alteration and ellipses supplied); doc. no. 43-13 (Amanda Duke Deposition), at 37-38 (The pool water was "[g]reen, cloudy...."); doc. no. 43-15 (C.B. Deposition), at 13 ("[T]he water was green, so you couldn't see through it.") (alteration supplied); doc. no. 43-16 (Gregory Walker Deposition), at 21 ("It looked like river water . . . . [I]t had a very dark tint. You could not see maybe a foot in front of you. . . . It was really nasty water.") (ellipses supplied and alteration).

[34] Doc. no. 46-7 (C.B. Deposition), at 11.

[35] *Id.* at 7, 12.

[36] *Id.* at 9. C.B. described the lifeguard as a female who "had either brown or blond hair, and she was probably about 16." *Id.*

[37] Doc. no. 43-14 (Jennifer Thomas Deposition), at 41 (alteration supplied).

[38] *Id.* at 45.

[39] *Id.* at 22; *see also id.* at 45 ("he didn't come back up").

the purpose of looking for Winston on the bottom of the pool, but Duke refused:[40] "she said they weren't allowed to do that. . . . They weren't allowed to let me go in, period, [and] they would look."[41]

Amanda Duke then walked into the lifeguard shack and asked two male lifeguards, James P. ("J.P.") Cooper and Trey Bundy, to search for Winston because she "couldn't see in the water" and feared that she would not find him if she searched alone.[42] Duke said that Cooper and Bundy searched the pool for "[c]lose to an hour maybe."[43] Head lifeguard Brittany Mason testified that Bundy and Cooper used goggles to search the pool's bottom for a similar length of time:

> Q.  *Were they swimming at the top of the water surface level?* Did they actually —
>
> A.  *They went down.*
>
> Q.  They went down?
>
> A.  Yes.
>
> Q.  So they both were in the deep end of the pool?
>
> A.  Both deep end and shallow end.
>
>     . . . .

---

[40] *Id.* at 45-46.

[41] *Id.* at 46 (ellipsis and alterations supplied).

[42] Doc. no. 39-2 (Amanda Duke Deposition), at 23-24.

[43] *Id.* at 32 (alteration supplied).

Q. *Swimming under the water?*

A. *Yes.*

Q. *Fully submerged under the water?*

A. *They went under the water* and then come [*sic*] up. They'd go from side to side.

Q. And how long did they search for Mr. Winston?

. . . .

A. Probably closer to an hour.

Doc. no. 39-1 (Brittany Mason Deposition), at 33-34 (emphasis and ellipses supplied).

At some point during the search, "a few" persons identified by Amanda Duke as Bert Winston's "family members," *allegedly* told her that "they thought he might have left. And then some family members [who] had left to see if he was at home, actually had come back and told us that *he was* at home. And that's when we decided to close the pool down [and cease searching for Winston]."[44]

A handwritten statement given to the Jackson County Sheriff by lifeguard Trey Bundy stated that:

---

[44] Doc. no. 39-2 (Amanda Duke Deposition), at 24 (alterations and emphasis supplied); *id.* at 32 (affirming counsel's assertion that "the reason [the other lifeguards] ceased looking for him is because someone came to the pool and told you he was at home") (alteration supplied). *See also* doc. no. 39-1 (Brittany Mason Deposition), at 34-35.

A little girl was saying that an old man went under the water and never came back up. We looked for the man before everything got out of hand. We didn't find him so I dove in and tried to find him. I went under and came up three times before I got out of the water. When I came back and told everyone that I did not see anything we told J.P. [Cooper] to look one more time just to be safe. J.P. said he didn't see anything. After we looked *everyone started to say he had went home so we had left it at that.*

*Id.* at 32 (alteration and emphasis supplied).

Another handwritten statement given to the Sheriff by lifeguard J.P. Cooper

recorded that:

I had just got off the stand for break and swam for about 5 minutes and then got out and went to play basketball at the courts. After about 15-20 minutes I heard a lot of commotion and Amanda [Duke] yelling "everyone out now" and so I started walking to the pool and people walking from the pool were saying a man went under and never came up. So I walked into the office and Amanda said "we have a situation" and I said I know and I asked if they wanted me to go check, and they said yes [be]cause I'm a good swimmer, so I grabbed my goggles and swam to the rope, I started at the rope and did laps back and forth, starting at the rope, I made laps until I came up at the ladder (about half way) *and Brittany [Mason] said "He's ok he is at home. We found him."* So I got out at the ladder and walked into the office *and they said everything is ok,* so we closed and I went to the park and shot b-ball and nothing seemed wrong and everyone said he was ok.

*Id.* at 30-31 (alterations and emphasis supplied).

The defendants' account of the duration and depth of the lifeguards' search was

disputed by church member Jennifer Thomas. She said that the lifeguards "put their

little goggles to their face[s] *and just put their head[s] in the water — barely in the*

*water* — [and they] said nobody was down there. And then they evacuated everybody."[45] C.B., the child who initially sounded the alarm about Winston slipping under the water, provided a similar account. She said that one of the male lifeguards "just got some goggles, and, like, got in the twelve-foot [end of the pool], and like sticked [*sic*] *his head like halfway down in the water. . . . [f]or like five seconds.*"[46]

Some support for plaintiff's assertion that the search was abbreviated is provided in a statement given to the Jackson County Sheriff by female lifeguard Melissa Estep, who wrote:

> I was on the stand in the shallow end when a woman asked where the man was so I started looking around for him and he wasn't in site [*sic*]. So at that time a little girl started saying he went down by the rope into the deep end so I blew the whistle and got everyone out of the pool. At that time Amanda [Duke] was looking for him and got Trey [Bundy] to get the goggles and he went down and looked several times. He seen nothing or no one [*sic*] so just to be safe we got J.P. [Cooper] to swim down and search also. *After about 5 min*[*utes*] *he stopped and all the people doing the party sayed* [*sic*] *that the man was at home. So we stopped looking* and [Councilman] Barry [Hughes] told us to close the pool because it was so cloudy, it was a safety hazard and very dangerous. We stayed for about an hour after the incident to close and get everyone out. We all thought the man was safe at home.

Doc. no. 39-1 (Plaintiff's Ex. 7 to Brittany Mason Deposition), at ECF 32, 30 (alterations and emphasis supplied).[47]

---

[45] Doc. no. 46-6 (Jennifer Thomas Deposition), at 46-47 (alterations and emphasis supplied).

[46] Doc. no. 46-7 (C.B. Deposition), at 16 (alterations and emphasis supplied).

[47] An obvious human error occurred when copying the pages of Plaintiff's Exhibit 7 to the

As previously noted, defendants contend that, at some point after a search for Winston began, they were told that he had been located at his residence.[48] By that time, Councilman Barry Hughes had returned to the pool to assess the situation, and he and head lifeguard Brittany Mason jointly decided to call off the search and close the pool.[49] No one summoned the police or emergency services.[50]

Winston's sister, plaintiff Rovena Hardrick, last talked with her brother the morning of his death, before he departed for the First Missionary Baptist Church. She told him that she would not drive to the picnic until later in the day, after her husband returned from work.[51] When plaintiff and her husband arrived at the park, the pool gate already had been closed and locked by Councilman Hughes and head lifeguard Mason.[52] Several children ran up to plaintiff's automobile and said that Winston had gone "under the water," but they overheard some of the lifeguards say that he had

---

deposition of Brittany Mason: *i.e.*, the first half of Melissa Estep's handwritten statement is reproduced at the bottom of page "ECF 32," and the second half at the top of page "ECF 30."

[48] *See* note 44, *supra*, and accompanying text.

[49] *See* doc. no. 39-1 (Brittany Mason Deposition), at 34-35 (**Q**. Why did Trey and J.P. stop searching for Mr. Winston? **A**. Amanda was told that they had went home – or that he had went home. They had got in touch with him. **Q**. Do you know who told Amanda that? **A**. No, sir. **Q**. Do you know if it was a child or an adult? **A**. It was an Adult. **Q**. An adult. Whose decision was it to stop searching for Mr. Winston? **A**. Mine and Barry's.").

[50] *Id.* at 35-36.

[51] *Id.* at 71; doc. no. 46-9 (William Hardrick Deposition), at 46.

[52] *See* doc. no. 46-1 (Plaintiff's Deposition), at 71-72.

"gone home."[53]  Plaintiff believed that to be out of character for her brother, because he had committed to help with the picnic.[54]  Even so, she drove to Winston's residence, but he was not there.[55]  She looked for him at the homes of friends, and asked acquaintances whether they had seen him walking around the neighborhood, but no one had seen him all day.[56]  When plaintiff could not find her brother, she drove to the police station and asked whether any of the officers had seen him. Again, no one had.[57]  Only then did plaintiff return to the park and tell church members that Winston was not at home, and that no one had seen him.[58]

Winston's friend, Arlene Robison, suggested that plaintiff should look for him around "US Stove," speculating that he might have become disoriented if he set off from the pool on foot.[59]  Plaintiff and Ms. Robison drove around, continuing to look for Winston, but with no success.[60]

While plaintiff and Ms. Robison continued to search for Winston, a man named Gregory Walker, who was visiting from out of town, on leave from the Army, joined

---

[53] *Id*. at 72-73.

[54] *Id.* at 74.

[55] *Id.*

[56] *Id.* at 75-77.

[57] *Id.*  at 77.

[58] Doc. no. 46-1 (Plaintiff's Deposition), at 78-79.

[59] *Id*. at 81-82.

[60] *Id.*

members of his family at the church function around 3:30 p.m. By that time, the pool had been closed and locked by Councilman Hughes and head lifeguard Mason, but the picnic continued.[61] Walker's sister, Tanesha, told him that some of the children said that Winston still was in the pool.[62] She asked Walker to go into the pool and look for Winston.[63] Walker jumped over the fence surrounding the pool and began to search the deep end.[64] Jennifer Thomas pointed Walker to the area that Winston last had been seen by the children.[65] Walker dove down and searched that area. Within ten to fifteen minutes, he located Winston's body and brought it to the surface.[66] Walker's brother-in-law, Antonio Brock, assisted him in removing Winston's body from the pool.[67] Walker and his sister, who is a nurse, attempted chest compressions in an effort to resuscitate Winston,[68] but it was far too late for such exertions. Winston's lifeless body remained on the pool deck for forty-five to ninety minutes before the Jackson County Coroner arrived around 6:00 p.m.[69]

---

[61] Doc. no. 46-10 (Gregory Walker Deposition), at 16-17.

[62] *Id.* at 19-20.

[63] *Id.* at 19.

[64] *Id.* at 20.

[65] Doc. no. 46-6 (Jennifer Thomas Deposition), at 60.

[66] Doc. no. 46-10 (Gregory Walker Deposition), at 20.

[67] *Id.* at 22-23.

[68] *Id.* at 23, 32-33. Walker was unable to administer mouth-to-mouth resuscitation because Winston's "mouth was seized up, locked." *Id.* at 33.

[69] *Id.* at 31.

The Coroner's Report of Death states that Winston was last seen at approximately 1:30 p.m., and that he was found dead three hours later, at about 4:45 p.m.[70] He was formally pronounced dead at 6:10 p.m.,[71] and his body transported to the morgue.[72]

## III. DISCUSSION

The claims asserted against the City and individual defendants in Count Eight of plaintiff's amended complaint are based upon 42 U.S.C. § 1983, a statute that authorizes civil suits against state, county, or municipal governmental entities or officials to recover damages for conduct under color of state law that allegedly deprived the plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal law.[73] The substantive due process claims asserted by plaintiff

---

[70] Doc. no. 43-13 (Jackson County Coroner's Report of Death Investigation).

[71] Doc. no. 46-14 (Exhibit M to Evidentiary Submission in Support of Motion for Summary Judgment by Defendants City of Bridgeport, Alabama and Mayor David Hughes), Exhibits to Declaration of Jack R. Kalin, Ph. D., at ECF 25 (Alabama Center for Health Statistics, Alabama Certificate of Death).

[72] Doc. no. 43-13 (Jackson County Coroner's Report of Death Investigation).

[73] Specifically, the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

under that statute have two elements: plaintiff's decedent died as a result of defendants' violation of a constitutional right; and, the constitutional right was "clearly established."

> Before a person, county, or municipality can be held liable under section 1983, a plaintiff must establish that she suffered a constitutional deprivation. *E.g., Bradberry v. Pinellas County*, 789 F.2d 1513, 1515 (11th Cir. 1986). Further, to impose individual liability on public officers, the plaintiff must prove that the defendants violated not only a constitutional right, but a "clearly established" constitutional right; otherwise the defendants are protected by qualified immunity. *E.g., Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146 (11th Cir. 1994) (*en banc*).

*Hamilton by and through Hamilton v. Cannon*, 80 F.3d 1525, 1528 (11th Cir. 1996).

The second element overlaps with the individual defendants' claim that they are entitled to qualified immunity: a defense that provides complete protection for state, county, or municipal governmental officials whose conduct violates "no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[74]

---

42 U.S.C. § 1983. The Supreme Court held, in *Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972), that the statute was enacted for the express purpose of enforcing the Fourteenth Amendment. *See also, e.g.*, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 834 (1985); *Monroe v. Pape*, 365 U.S. 167, 171 (1961).

[74] *See also, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).

The Supreme Court's opinion in *Saucier v. Katz*, 533 U.S. 194 (2001), outlined a two-part test for evaluating when an individual defendant was entitled to claim the benefits of "qualified immunity." The threshold question was whether the facts, viewed "in the light most favorable to the party asserting the injury," showed that the governmental official's conduct violated a constitutional

As for the City, it cannot be held liable on a theory of *respondeat superior*: the principle that an employer must answer for the wrongful acts of an employee. *See Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). Rather, plaintiff must show that any constitutional deprivation resulted from an official custom or policy. *Bradberry v. Pinellas County*, 789 F.2d 1513, 1515 (11th Cir. 1986); *Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir. 1985).

Plaintiff's claims against the individual defendants will be examined first.

A.     **The First Element**: *a constitutional deprivation*

The Due Process Clause of the Fourteenth Amendment, which is the constitutional basis for the claims alleged in Count Eight, provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law."[75] That language requires a state, county, or municipality to follow fair and clearly defined *procedures*, such as notice and an opportunity to be heard, before depriving "any person of life, liberty, or property." *See, e.g.*, *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and [an] opportunity for [a] hearing appropriate to the nature of the case.") (citation and

---

right? *Id* at 201. If that question was answered "yes," the court then proceeded to analyze the second aspect of the inquiry: *i.e.,* "whether the right was clearly established." *Id.*

[75] U.S. CONST., amend XIV, § 1 (1868).

internal quotation marks omitted, alterations supplied).[76]

However, plaintiff does not assert a deprivation of Bert Winston's *procedural* due process rights. Instead, she relies upon the so-called "substantive component" of the Due Process Clause, which protects an individual's life, liberty, or property from "'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).[77]

The substantive due process rights of persons *who are not in custody*[78] are violated only when state and local governmental officials cause harm by engaging in

---

[76] *See also*, *e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of [procedural] due process is protection of the individual against arbitrary action of government.") (alteration supplied); *Hurtado v. California*, 110 U.S. 516, 527 (1884) (observing that the Due Process Clause was "'intended to secure the individual from the arbitrary exercise of the powers of government.'") (quoting *Bank of Columbia v. Okely*, 4 Wheat. (17 U.S.) 235, 244 (1819)).

[77] The Due Process Clause "guarantees more than fair process," *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997), and encompasses a substantive component that "protects against government power arbitrarily and oppressively exercised." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Daniels*, 474 U.S. at 331).

[78] The Supreme Court has emphasized that *consensual relationships* between individuals and state, county, or municipal officials are different from *custodial relationships*, *which arise from incarceration and other involuntary confinement*. Where non-custodial relationships are involved, the government can be held liable under the substantive due process clause only when an official's act or omission may properly be characterized as arbitrary, or conscience shocking, in a constitutional sense. *See*, *e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992); *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999).

As the Eleventh Circuit observed in *Wideman v. Shallowford Community Hospital, Inc.*, 826 F.2d 1030, 1035 (11th Cir. 1987), the "primary thread weaving these special relationship cases together is the notion that if the state takes a person into custody . . . or assumes responsibility for that person's welfare, a 'special relationship' may be created in respect of that person."

conduct that can properly be characterized as arbitrary or conscience shocking in a constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Collins*, 503 U.S. at 128*; Neal v. Fulton County Board of Education*, 229 F.3d 1069, 1074 (11th Cir. 2000); *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999).

The Supreme Court has been careful to note, however, that a plaintiff's requirement to demonstrate that harmful conduct was arbitrary or conscience-shocking in a constitutional sense is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976).[79] Instead, when injurious conduct was "merely negligent, 'no procedure for compensation is constitutionally required.'" *Daniels*, 474 U.S. at 333 (quoting *Parratt v. Taylor*, 451 U.S. 527, 548 (1981)).

Thus, the first element of a substantive due process claim "is to be narrowly interpreted and applied." *White*, 183 F.3d at 1259 (quoting *Collins*, 503 U.S. at 128). "To rise to the conscience-shocking level, conduct most likely must be 'intended to injure in some way unjustifiable by any government interest.'" *Davis v. Carter*, 555

---

[79] *See also, e.g.*, *Lewis*, 523 U.S. at 848 (holding that the concept of arbitrary, or conscience-shocking conduct "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability"); *Neal v. Fulton County Board of Education*, 229 F.3d 1069, 1074 (11th Cir. 2000) ("Thus, 'the Fourteenth Amendment is not a "font of tort law" that can be used, through section 1983, to convert state tort claims into federal causes of action.'") (citations omitted); *White*, 183 F.3d at 1257 (observing that "the Supreme Court has been 'reluctant to expand the concept of substantive due process,'" and that "judicial self-restraint requires courts to exercise the utmost care in this area") (quoting *Collins*, 503 U.S. at 125).

F.3d 979, 982 (11th Cir. 2009) (quoting *Lewis*, 523 U.S. at 849).

Neither the allegations of Count Eight, nor the facts outlined in Part II of this opinion, even when those facts are construed most strongly in favor of plaintiff, demonstrate conduct that can properly be characterized as arbitrary or conscience shocking in a constitutional sense.[80] The evidence of *negligence* is *overwhelming*, but none of the individual defendants' acts or omissions shock the conscience, or show an intent to injure Bert Winston.

**B.     The Second Element**: *the constitutional right was "clearly established"*

Even assuming that plaintiff could satisfy the first element of a substantive due process claim, she cannot point to binding precedent establishing that the constitutional rights allegedly violated by defendants were "clearly established" on the date of Bert Winston's death.  Instead, the contrary is true.  The Eleventh Circuit has held that there is no constitutional obligation to provide protective services for persons who are not in custody.[81]  *Bradberry v. Pinellas County*, 789 F.2d 1513, 1516 (11th Cir. 1986) (holding that a substantive due process claim did not lie against a

---

[80] *Cf., e.g.*, *Davis v. Carter*, 555 F.3d 979, 980-81 (11th Cir. 2009) (no constitutional violation where the conduct of football coaches who subjected a student to a rigorous workout session and ignored his complaints of dehydration did not rise to the level of conscience shocking, even though their actions may have caused his death); *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (instructor at military academy who slammed classroom door causing student's arm to become lodged in shattered glass window pane and shoved her in the face to dislodge her did not deprive her of substantive due process).

[81] *See* note 78, *supra*, and accompanying text.

county for failing to provide adequately trained lifeguards). *See also Jackson v. City of Joliet*, 715 F.2d 1200, 1202 (7th Cir. 1983) (holding that there is no general duty to rescue a stranger in distress, even if the rescue can easily be accomplished, and that a negligent or grossly negligent rescue attempt by a state employee is not the equivalent of a deprivation of right to life without due process of law). *Cf.*, *e.g.*, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) (holding that public officials have no constitutional duty to rescue or protect individuals who are not in custody). During oral argument, plaintiff attempted to distinguish *Bradberry,* arguing that, in that case, the decedent put himself at danger by swimming in an unauthorized area. That argument is unavailing because Winston, who presumably knew that he could not swim, nevertheless entered the cloudy pool. As such, it could be said that he put himself in danger much as did the decedent in *Bradberry*.

Further, as the Eleventh Circuit made abundantly clear in *Hamilton*, even rescue attempts thwarted by a government official are insufficient to support a section 1983 claim for deprivation of substantive due process. 80 F.3d at 1532 ("It would take much creativity and imagination to glean from the factually distinguishable cases upon which the plaintiffs rely a clearly established rule of law that an unsuccessful, negligent, or reckless rescue attempt, or interference with a bystander's rescue

attempt, amounts to a constitutional violation. We decline to exercise such creativity and imagination, because the qualified immunity doctrine prohibits it."). The court therefore finds that there is no "clearly established law" that the lifeguards' inadequate rescue attempts alleged by plaintiff were unconstitutional.

## C.    "Qualified Immunity"

The conclusion that the constitutional rights claimed by plaintiff were not clearly established is just another way of saying that plaintiff failed to overcome the qualified immunity defense interposed by the individual defendants.

> To overcome the qualified immunity defense, the contours of the right allegedly violated must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. *E.g., Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987). That is to say, "[u]nless a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter*, 28 F.3d at 1149. "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993).

*Hamilton*, 80 F.3d at 1528. None of the acts of the individual defendants violated "clearly established law," even if plaintiff had established a constitutional deprivation. Each individual defendant is entitled to qualified immunity, and their motions for summary judgment based upon plaintiff's remaining claim under 42

U.S.C. § 1983 are due to be granted.

## D.    Claims Against the City of Bridgeport, Alabama

Turning to plaintiff's claims against the City of Bridgeport, as distinguished

from those of the individual defendants discussed above, the Supreme Court has held

that, when the language of section 1983 is read against the background of its

legislative history, it

> compels the conclusion that Congress did not intend municipalities to
> be held liable unless action pursuant to official municipal policy of some
> nature caused a constitutional tort.  In particular, we conclude that a
> municipality cannot be held liable solely because it employs a tortfeasor
> — or, in other words, a municipality cannot be held liable under § 1983
> on a *respondeat superior* theory.

*Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978).  In other words,

a municipality may be held liable only if plaintiff establishes that her decedent

"suffered a constitutional deprivation *and that the deprivation resulted from an*

*official custom or policy*."  *Bradberry*, 789 F.2d at 1515 (citing *Anderson v. City of*

*Atlanta*, 778 F.2d 678 (11th Cir. 1985)) (emphasis supplied).  The Eleventh Circuit's

opinion in *Bradberry* also observed that:

> In any accident case involving the public highways, the skies, or even
> bodies of water, the injured party can always argue that a better
> equipped and better trained public safety system could have averted the
> injuries.  But, the federal Constitution does not require states[, counties,
> or municipalities] to expend their resources to guard against such
> accidents, and therefore it would be anomalous to hold them liable when

26

they attempt to do so and fail in their effort.

789 F.2d at 1517 (alteration supplied). Here, as in *Bradberry* and *Hamilton*, no constitutional deprivation has been established. Thus, there is no basis upon which the City of Bridgeport can be held liable.

Even assuming that plaintiff had shown a violation of Winston's constitutional rights, she has produced no evidence that the deprivation was the result of an official custom or policy of the City. One incident is not sufficient to impose liability against a municipality.

> "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality. *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985) (plurality opinion). "A pattern of similar constitutional violations . . . is 'ordinarily necessary.' " *Connick v. Thompson*, 563 U.S. —, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997)). "A single incident would not be so pervasive as to be a custom," *Grech*, 335 F.3d at 1330 n.6, because a custom must be such "a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it," *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). This requirement of proof "prevents the imposition of liability based upon an isolated incident," *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004), and " 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality,' " *id.* (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 403–04, 117 S. Ct. at 1388). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate

> decisionmaker may fairly subject a municipality to liability on the theory
> that the relevant practice is so widespread as to have the force of law."
> *Bd. of Cnty. Comm'rs*, 520 U.S. at 404, 117 S. Ct. at 1388. "In the
> absence of a series of constitutional violations from which deliberate
> indifference can be inferred, the plaintiff[ ] must show that the policy
> itself is unconstitutional." *Estate of Novack ex rel. Turbin v. Cnty. of
> Wood*, 226 F.3d 525, 531 (7th Cir. 2000).

*Craig v. Floyd County*, 643 F.3d 1306, 1310-1311 (11th Cir. 2011).

Moreover, "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality." *Id.* at 1311 (alteration supplied). Accordingly, the City also is entitled to summary judgment on the claim for deprivation of Winston's substantive due process rights asserted by plaintiff under 42 U.S.C. § 1983.

## E.      Supplemental State Law Claims

In cases such as this one, in which the District Court's jurisdiction is based solely upon a federal question, the court has discretion to entertain state claims that are supplemental to the federal claim. *See* 28 U.S.C. § 1367(a).[82] Even so, the district

---

[82] 28 U.S.C. § 1367(a) provides that:

> (a) Except as provided in subsections (b) and (c) or as
> expressly provided otherwise by Federal statute, in any civil action of
> which the district courts have original jurisdiction, the district courts
> shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that
> they form part of the same case or controversy under Article III of the
> United States Constitution. Such supplemental jurisdiction shall
> include claims that involve the joinder or intervention of additional
> parties.

court may decline to exercise supplemental jurisdiction when:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Supreme Court added a gloss to the foregoing statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent [now "supplemental"] state-law claims. When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early states and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id.* at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will

point toward declining to exercise jurisdiction over the remaining state-law claims."

*Carnegie-Mellon*, 484 U.S. at 350 n.7 (alteration supplied); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims").

Here, plaintiff's federal claims have been eliminated before trial, and the state law claims raise complex issues of state law — *i.e.*, whether Alabama's so-called "recreational use" immunity applies,[83] and whether the individual defendants are entitled to "state-actor" immunity[84] — "something the courts of Alabama are in the best position to undertake and, for reasons of federalism, *should* undertake in this sensitive area." *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (emphasis supplied).[85] Moreover, plaintiff originally filed this action in state court on October

---

[83] *See* Ala. Code §§ 35-15-1 through 35-15-5; Ala. Code §§ 35-15-20 through 35-15-28 (1975).

[84] *See Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).

[85] When discussing the retention of jurisdiction over supplemental state law claims after all federal questions had been resolved, the Eleventh Circuit's *Nolin* opinion observed that:

> At this time, the case retains no independent basis for federal jurisdiction and the only claims that remain deal with complex questions of discretionary function immunity in the state of Alabama. A proper resolution of the two state law causes of action will require a careful analysis of Alabama law — something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area. *We conclude that the district court should dismiss the state law claims so that Appellee may pursue them in state court.*

*Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (emphasis supplied).

13, 2014,[86] and did not amend her complaint to include federal claims until July 11, 2016,[87] more than a year after the state court judge denied defendants' motion to dismiss.[88] Thus, the state law claims predominate in this case. This court finds that the balance of factors weigh in favor of declining supplemental jurisdiction, and exercises its discretion to remand plaintiff's state law claims.

## V. CONCLUSIONS AND ORDERS

In accordance with the foregoing discussion, it is **ORDERED**, **ADJUDGED**, and **DECREED** that defendants' motions for summary judgment be, and the same hereby are, GRANTED with respect to the federal claims asserted by plaintiff under 42 U.S.C. § 1983, and that those claims be, and the same hereby are, DISMISSED with prejudice. Plaintiff's state law claims for negligence against the City of Bridgeport, and for negligence, recklessness, and/or wantonness against Bridgeport Mayor David Hughes, Bridgeport Councilman Barry Hughes, and the head lifeguard of Bridgeport's municipal swimming pool, Brittany Mason, are REMANDED to the Circuit Court of Jackson County, Alabama, from which this action was removed.

Plaintiff's motion to strike the testimony of Dr. Jack Kalin and Steve Scheuer,[89]

---

[86] Doc. no. 1-1 (State Court Pleadings), at ECF 2-6 (Original Complaint).

[87] *Id.* at ECF 143-64 (First Amended Complaint).

[88] *Id.* at ECF 107 (Order entered April 30, 2015, denying defendants' motion to dismiss).

[89] Doc. nos. 47 & 48.

and defendant Barry Hughes's motion to preclude the testimony of Dr. Roger Rinn and Dr. Brian Frist,[90] are each DENIED as moot. Costs are taxed to the party who or which incurred them. The Clerk is directed to close this file.

    **DONE** and **ORDERED** this 25th day of May, 2018.

                                       _____
                                       United States District Judge

---

[90] Doc. no. 59.